LENK, J.
**455 On the evening of September 20, 2007, two men opened fire at the Academy Homes residential complex, killing Urel Duncan and injuring Kevon Grant. The defendant and Shawn Daughtry subsequently were indicted on charges of murder in the first degree, G. L. c. 265, § 1 ; armed assault with intent to murder, G. L. c. 265, § 18(b ) ; and firearm offenses pursuant to G. L. c. 265, § 10(a ), (h ), and (n ), in conjunction with the shooting.
The Commonwealth's theory at trial was that the defendant was a member of the Walnut Park gang, and that both he and Daughtry previously had been shot at by members of the rival Academy Homes gang. The men went together to the Academy Homes complex for the purpose of retaliating; they intended to shoot the first people they saw. A Superior Court jury found the **456 defendant guilty of all charges.[1]
Of the claims raised by the defendant on appeal, we determine that four constitute error: (1) Daughtry's statements should not have been admitted against the defendant; (2) the Commonwealth's gang expert gave improper testimony; (3) police witnesses should not have given their opinions as to the identity of individuals depicted in surveillance footage; and (4) the prosecutor engaged in impermissible argument during closing. In light of at least the first three trial errors, we conclude that the defendant's convictions must be vacated and set aside, and the matter remanded to the Superior Court for a new trial. We determine, however, that there was no error in the motion judge's denial of the defendant's motion to suppress.
Facts. We recite the facts the jury could have found, in the light most favorable to the Commonwealth, reserving additional facts for later discussion. See Commonwealth v. Platt, 440 Mass. 396, 397, 798 N.E.2d 1005 (2003). Around 9:20 P . M . on September 20, 2007, two men walked up a street in the Academy Homes housing complex in the Roxbury section of Boston. One wore a gray hooded sweatshirt; the other wore a black hooded sweatshirt.
*670 Upon seeing four individuals sitting on a porch, the two men each pulled out a gun. Three to four shots were fired.[2] Duncan was shot in the head and died the next day; Grant was shot in the ankle and survived. The perpetrators fled on foot.
Police officers arrived within minutes of the shooting. After speaking with witnesses, police began to search for two men wearing gray and black hooded sweatshirts. Police knew that the Academy Homes housing complex was the territory of the Academy Homes gang, and that there were rival gangs in the area. Accordingly, officers canvassed the territory of several rival gangs, including the Walnut Park area, which was associated with a gang known as the Walnut Park Dogs.
Approximately fifty minutes after the shooting, police stopped the defendant and Daughtry[3] coming out of a building in Walnut Park. The defendant was wearing a gray hooded sweatshirt with **457 a large zipper running down the middle, a white T-shirt, jeans, and light-colored sneakers. Daughtry was wearing a black hooded sweatshirt, black pants, and black shoes.
Police pat frisked the two men,[4] separated them, and questioned them. While each denied involvement in the shooting, they gave conflicting statements about where they had been at that time. Daughtry claimed to have met with the defendant and a third individual, "Dee," fifteen minutes earlier. The defendant said that he had spent the afternoon with Daughtry, and that the two had just come from visiting the defendant's "Uncle Mike."
Police learned that the shooting had been captured on surveillance footage by an Academy Homes security camera. The men depicted on the security footage wore clothing similar to that which the defendant and Daughtry were wearing when they were stopped by police, and were of approximately the same height and weight.[5]
The defendant and Daughtry were transported to Boston police headquarters, where their hands and clothing were tested for gunshot residue. Daughtry's left hand tested positive; the defendant's hands and clothing tested negative. Both men were charged with murder in the first degree, armed assault with intent to murder, and firearms offenses. They were tried separately.
The Commonwealth's theory at the defendant's trial in November and December of 2009 was that the defendant and Daughtry went to the Academy Homes complex to retaliate for prior shootings in which they had been the targets. In February 2007, the defendant was shot and injured near his home. Seven months later, on September 10, 2007, Daughtry was shot at in the "general area" of Walnut Park.
Detective Sixto Merced of the Boston police department testified as a gang expert. He explained that, at the time of the shooting, the Walnut Park and Academy Homes gangs had an ongoing rivalry. Police believed that the defendant was a *671 member of the Walnut Park gang, but they did not believe that Daughtry was a gang member. Although the victims were not members of any gang, they lived next door to members of the Academy Homes gang.
Prior proceedings. The defendant was convicted of all charges.
**458 In November 2014, he filed a motion for a new trial. The defendant's appeal from the denial of that motion was consolidated with his direct appeal.
On appeal, the defendant points to numerous asserted errors. He argues that (1) Daughtry's statements to police were erroneously admitted as evidence against him; (2) the Commonwealth's gang expert impermissibly concluded that the defendant was a member of a gang, and his descriptions of general gang activities were unfairly prejudicial; (3) multiple police witnesses improperly opined that the individual depicted in security footage was the defendant; (4) the prosecutor engaged in impermissible argument in closing; (5) the defendant's motion to suppress should have been allowed; (6) trial counsel was ineffective because he did not challenge certain testimony relating to gunshot residue testing; (7) trial counsel did not properly challenge misleading evidence; (8) trial counsel should have called a particular witness; and (9) the denial of the defendant's postconviction motions for funds and an evidentiary hearing was error. With respect to the first four categories of error, we agree.
Standard of review. Where the defendant objected, we review to determine whether there was error and, if so, whether "there is a reasonable possibility that the error might have contributed to the jury's verdict," or whether we can be assured that the evidence "did not influence the jury, or had but very slight effect" (citations omitted). See Commonwealth v. Sullivan, 478 Mass. 369, 376, 85 N.E.3d 934 (2017) ; Commonwealth v. Carriere, 470 Mass. 1, 7, 18 N.E.3d 326 (2014). Where the preserved error is constitutional, "we evaluate the admission of constitutionally proscribed evidence to determine whether it was harmless beyond a reasonable doubt." See Commonwealth v. Nardi, 452 Mass. 379, 394, 893 N.E.2d 1221 (2008). Where the defendant did not object, we review for a substantial likelihood of a miscarriage of justice. Carriere, supra at 8, 18 N.E.3d 326, citing Commonwealth v. Wright, 411 Mass. 678, 682, 584 N.E.2d 621 (1992), S.C., 469 Mass. 447, 14 N.E.3d 294 (2014). "In analyzing a claim under the substantial likelihood standard, we review the evidence and case as a whole and consider whether any error made in the course of the trial was likely to have influenced the jury's conclusion." Commonwealth v. Berry, 457 Mass. 602, 618, 931 N.E.2d 972 (2010), S.C., 466 Mass. 763, 2 N.E.3d 177 (2014).
Discussion. 1. Coventurer statements. At trial, a number of police officers testified to statements made by Daughtry after the **459 shooting.[6] They pointed out inconsistencies between Daughtry's statements about his activities near the time of the shooting and the defendant's statements. From this, the prosecutor argued that the statements proved the two men were lying.
The first statement was made within approximately one hour of the shooting, when Daughtry told Sergeant Thomas Teahan of the Boston police department that he had been in the area "a short time," and had met with the defendant only fifteen minutes earlier. Daughtry said that he and the defendant briefly had been at the home of someone named "Dee," and *672 he provided an address. The second statement was given several hours later, at Boston police headquarters; at that time, Daughtry told Detective Dennis Harris that he had been "smoking a blunt," alone, at the time of the shooting. He heard four or five gunshots, walked "out front," and encountered the defendant walking down the street with Dee. According to Daughtry, the two men were wearing gray and black hooded sweatshirts, respectively.[7]
The defendant asserts that Daughtry's statements should have been excluded as hearsay, and also that their admission violated his rights to confrontation under the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights.[8]
a. Hearsay. i. Joint venturer statements. Massachusetts recognizes a joint venture exemption to the hearsay rule. See Commonwealth v. Wood, 469 Mass. 266, 280, 14 N.E.3d 140 (2014) ; Mass. G. Evid. § 801(d)(2)(E) (2019).[9] Just as a defendant's statements are admissible against the defendant, so too are certain statements made by a defendant's coventurers. The exemption applies only where a defendant's coventurer makes a statement both "during the pendency of the cooperative effort" and "in furtherance of its **460 goal" (citation omitted). See Commonwealth v. Raposa, 440 Mass. 684, 659, 801 N.E.2d 789 (2004).
The rationale for the exemption is twofold. See Commonwealth v. Rakes, 478 Mass. 22, 36, 82 N.E.3d 403 (2017). First, while acting "in furtherance of" a "common object," coventurers are considered agents for one another. See Commonwealth v. Bright, 463 Mass. 421, 426, 974 N.E.2d 1092 (2012), quoting Commonwealth v. Tivnon, 8 Gray 375, 381, 74 Mass. 375 (1857). Accordingly, where their interests are sufficiently aligned, a statement by a coventurer is "deemed equivalent to a statement by the defendant" (quotation and citation omitted). Carriere, 470 Mass. at 8, 18 N.E.3d 326. Second, the exemption derives from the policy considerations underpinning the prohibition against hearsay. Whereas courts generally are wary of the reliability of out-of-court statements, "[t]he community of activities and interests which exists among the coventurers during the enterprise tends in some degree to assure that their statements about one another will be minimally reliable." Commonwealth v. White, 370 Mass. 703, 712, 352 N.E.2d 904 (1976). See Rakes, supra at 37, 41, 82 N.E.3d 403.
To introduce out-of-court statements as a statement of a joint venturer, the Commonwealth must show, by a preponderance of the evidence, that a joint venture existed between the declarant and the defendant, and that the statement was made in furtherance of the joint venture, while the joint venture was ongoing.[10] See Rakes, 478 Mass. at 37, 82 N.E.3d 403.
*673 It is well established that statements made after a joint venture has ended are not admissible under the hearsay exemption. See Commonwealth v. Winquist, 474 Mass. 517, 522, 52 N.E.3d 105 (2016) ; Commonwealth v. Andrews, 403 Mass. 441, 452, 530 N.E.2d 1222 (1988). To determine whether a joint venture has ended, our inquiry "focuses not on whether the crime has been completed," Carriere, 470 Mass. at 10, 18 N.E.3d 326, but on whether the coventurers' interests are still "closely bound together, tending to ensure the reliability of their statements" (citation omitted). See Commonwealth v. Mavredakis, 430 Mass. 848, 863, 725 N.E.2d 169 (2000). When a joint venture ends, "there is a dispersion of interests, and motives of self-preservation, not to speak of malice or spite, may take over." Commonwealth v. Santos, 463 Mass. 273, 291, 974 N.E.2d 1 (2012), quoting White, 370 Mass. at 712, 352 N.E.2d 904.
In some cases, statements made after the commission of a **461 crime nonetheless may continue to advance the goals of the joint venture. See Carriere, 470 Mass. at 11, 18 N.E.3d 326. For example, where coventurers meet to align their alibis or plan to evade capture, the statements they make to one another may be part of an ongoing joint venture. See, e.g., Commonwealth v. Burton, 450 Mass. 55, 63, 876 N.E.2d 411 (2007) (meeting to discuss what had happened and where murder weapon was hidden). See also White, 370 Mass. at 709 n.8, 352 N.E.2d 904. Such was not the case here.
Daughtry's first statements were made to police officers approximately one hour after the shooting. While Daughtry placed himself elsewhere at the time of the shooting, he produced no such alibi for the defendant.[11] In his second statement, Daughtry claimed that, after he heard gunshots, he walked around a building and encountered the defendant and a man named "Dee" on the street. At the time of the interview, Daughtry already had been informed that police sought two suspects for the shooting, one wearing a "gray hoodie," the other wearing a "black hoodie." Daughtry described the defendant and Dee as having been dressed in gray and black hooded sweatshirts. In both statements, he insisted that he had not been with the men earlier in the evening.
Daughtry's statements reveal that his interests at that point were no longer "closely bound together" with those of the defendant (citation omitted).[12] Mavredakis, 430 Mass. at 863, 725 N.E.2d 169. Daughtry's description inculpated the defendant and Dee in the shooting, while attempting to exculpate himself. As the prosecutor *674 urged in closing, "Clearly, ... Daughtry wanted to distance himself from the defendant." "[N]either the 'pendency' nor the 'furtherance' requirement is met" where a coventurer shifts the **462 blame to another defendant. See White, 370 Mass. at 711, 352 N.E.2d 904 (coventurer explicitly accused defendant of crime). See also Santos, 463 Mass. at 291, 974 N.E.2d 1 (error in admitting statements that were intended to exculpate declarant by inculpating defendant). Even if the statements could be said to evince an ongoing effort to cover up the crime, the effort "was not a 'common' one." See White, supra. Contrast Raposa, 440 Mass. at 690-691, 801 N.E.2d 789 (defendant and coventurer "continued to cooperate" where they contacted police together and shared mutual goal of silencing witnesses, and coventurer made statements "in an attempt to divert [police] attention from himself and the defendant"); Mavredakis, supra at 863 n.17, 725 N.E.2d 169 (coventurers told police defendant was not at scene of crime).[13]
As Daughtry's statements were not made during and in furtherance of a joint venture, the judge erred in allowing them to be introduced under the joint venture exemption to the hearsay rule.[14]
ii. Truth of the matter asserted. In the alternative, the Commonwealth argues that Daughtry's statements were not offered for their truth, but, rather, to demonstrate that Daughtry and the defendant were lying. Where no exception applies, the rule against hearsay prohibits the admission of out-of-court statements offered to prove the truth of the matter asserted. See Mass. G. Evid. § 801(c)(2) (2019). Statements offered for a nontruth purpose are not hearsay. See Commonwealth v. Keown, 478 Mass. 232, 245, 84 N.E.3d 820 (2017), cert. denied, --- U.S. ----, 138 S. Ct. 1038, 200 L.Ed.2d 292 (2018).
That Daughtry and the defendant gave conflicting statements suggests that one or both men were lying, although it does not **463 suggest which.[15] If the Commonwealth could have established that Daughtry's statements were false, and that they were made in coordination with the defendant, the statements might have been admissible for the nontruth purpose of showing that the two men conspired together, or shared consciousness of guilt.[16] Cf. *675 Commonwealth v. Pytou Heang, 458 Mass. 827, 854, 942 N.E.2d 927 (2011) (statement of codefendant admitted for "falsity and for its similarity to the defendant's statements"); Commonwealth v. Brum, 438 Mass. 103, 116-117, 777 N.E.2d 1238 (2002) (coventurer's statement admissible to show he had coordinated with defendant to give "identically false accounts of the same precise details").
The statements, however, were not admitted for a nontruth purpose, and the judge did not instruct the jury that Daughtry's statements could not be considered for their truth.[17] See Commonwealth v. Purdy, 459 Mass. 442, 453, 945 N.E.2d 372 (2011) (defendant entitled to limiting instruction where Commonwealth offered out-of-court statement for nontruth purpose). See also Commonwealth v. Caillot, 454 Mass. 245, 255-256, 909 N.E.2d 1 (2009), cert. denied, 559 U.S. 948, 130 S.Ct. 1525, 176 L.Ed.2d 127 (2010) (admission of statements without limiting instruction was error where statements reasonably might be considered for their truth). To the contrary, the judge instructed that the statements could be used against the defendant if the Commonwealth established evidence of a joint venture. Accordingly, the jury improperly could have considered the statements for their truth.
b. Confrontation clause. The defendant maintains that the admission of Daughtry's statements also violated the defendant's right to confront the witnesses against him. Where an individual does not appear at trial, that individual's "testimonial" out-of-court **464 statements are not admissible against a criminal defendant absent unavailability and a prior opportunity for cross-examination. See Crawford v. Washington, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).
Testimonial statements are those made with the primary purpose of "creating an out-of-court substitute for trial testimony." See Commonwealth v. Imbert, 479 Mass. 575, 580, 97 N.E.3d 335 (2018), quoting Michigan v. Bryant, 562 U.S. 344, 358, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011). A statement made in response to police questioning is testimonial where "the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." See Commonwealth v. Middlemiss, 465 Mass. 627, 633, 989 N.E.2d 871 (2013), quoting Davis v. Washington, 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). Compare Commonwealth v. Smith, 460 Mass. 385, 395, 951 N.E.2d 674 (2011) (statements were not testimonial where primary purpose was to aid officers in terminating ongoing emergency). The test is an objective one; we examine "the primary purpose that a reasonable person would have ascribed to the statement, taking into account all of the surrounding circumstances."[18] Imbert, supra, quoting *676 Williams v. Illinois, 567 U.S. 50, 84, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012).
Here, Daughtry made statements to police in response to questions regarding his whereabouts, and those of the defendant, in relation to a shooting that the officers were investigating. The statements were not made to resolve an ongoing emergency or to procure medical aid. Contrast Middlemiss, 465 Mass. at 635-636, 989 N.E.2d 871 **465 (purpose of 911 call was to intercept armed fugitive and procure medical treatment for shooting victim). The shooting had taken place more than one hour earlier, and police were investigating the alibis of potential suspects. In the circumstances presented here, the statements were testimonial.[19] As Daughtry did not testify at the defendant's trial, admission of his statements was barred by the Sixth Amendment.[20]
c. Prejudicial effect. The defendant objected to the admission of Daughtry's statements as both hearsay and as a violation of his right to confrontation. With respect to hearsay, we review for prejudicial error. See Sullivan, 478 Mass. at 375-376, 85 N.E.3d 934. With respect to preserved constitutional error, we must vacate the conviction unless we are satisfied that the error was harmless beyond a reasonable doubt. See Nardi, 452 Mass. at 394, 893 N.E.2d 1221.
Throughout her closing argument, the prosecutor repeatedly emphasized the importance of Daughtry's statements. She claimed that the jury could made an "identification" of the perpetrators through "Daughtry's own statements." She also urged the jury to think about the two men's "completely contradictory" statements, and argued that the contradictions proved the defendant's guilt:
"So, ladies and gentlemen, what are they lying about? What are they covering up? Why did they give two completely false statements? Why did they give two completely *677 contradictory statements? Ladies and gentlemen, that's not a coincidence, that's a cover-up."
The jury thus were left to choose between believing either that Daughtry told the truth[21] and the defendant likely had committed the crimes with Dee, or that Daughtry was covering up his own **466 participation in the crimes and his consciousness of guilt could be imputed to the defendant. In either case, Daughtry's statements risked influencing the jury's verdicts. Under both our constitutional and nonconstitutional standards of review, the error sufficiently prejudiced the defendant so as to constitute grounds for a new trial.
2. Gang expert. Merced testified as a gang expert. The defendant does not challenge the detective's testimony with respect to whether the Walnut Park and Academy Home gangs operated in the area, or whether they were rivals. Rather, the defendant claims that the detective's testimony was improper in two ways: (1) his opinion that the defendant was a member of the Walnut Park gang lacked proper foundation, and (2) his testimony as to a variety of illicit activities conducted by gangs was unduly prejudicial.
a. Gang affiliation. The detective was permitted to testify, over the defendant's objections, that the defendant was a member of the "Walnut Park Dogs." The defendant contends that the detective's conclusion lacked sufficient foundation. We review for prejudicial error. See Sullivan, 478 Mass. at 375-376, 85 N.E.3d 934.
We note first that Merced was properly qualified as an expert. See Mass. G. Evid. § 702(a) (2019) (requiring "scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue"). Second, where the Commonwealth maintained that the motive for the killing was a gang rivalry, the detective's specialized information could help the jury understand pertinent facts. "Expert opinion testimony must rest on a proper basis, else inadmissible evidence might enter in the guise of expert opinion" (quotation and citation omitted). Commonwealth v. Barbosa, 477 Mass. 658, 667, 81 N.E.3d 293 (2017). Proper bases include "facts within the witness's direct personal knowledge," facts already introduced in evidence, or "unadmitted but independently admissible evidence." Id., citing Mass. G. Evid. § 703 (2017).[22] See Department of Youth Servs. v. A Juvenile, 398 Mass. 516, 531, 499 N.E.2d 812 (1986). See also **467 Commonwealth v. Piantedosi, 478 Mass. 536, 543, 87 N.E.3d 549 (2017) (in addition to personal knowledge, expert witnesses are permitted to rely upon unadmitted but independently admissible evidence, that is, evidence that "would be admissible with the proper witness or foundation"). In Barbosa, supra at 668, 81 N.E.3d 293, for example, a police officer was permitted to opine as to a defendant's gang affiliation where he had known the defendant for *678 many years, had repeatedly seen the defendant with gang associates "and at the address of the gang's headquarters," and had personally "observed [him] wearing ... gang colors and in the presence of ... gang leaders on multiple occasions."
A voir dire hearing was conducted, outside the jury's hearing, in order to determine the basis for Merced's conclusions regarding the defendant. Although Merced had known the defendant from the time the defendant was eight years old, Merced had accumulated relatively little personal knowledge connecting the defendant to any gang. The defendant had never self-identified as a member of any gang.[23] He did not frequent a gang's headquarters, speak with identified gang leaders, or wear gang colors. Merced was aware of graffiti that listed members of the Walnut Park gang, but the defendant's name was not among those listed. Nor was Merced able to link the defendant to any gang by signs, symbols, street names, or tattoos. Rather, during voir dire, Merced explained that he believed the defendant belonged to a gang, in part, because the defendant was listed in the Boston regional intelligence center "gang database":
Q.: "And can you tell us why he would be considered a gang member?"
A.: "I believe in 2005 he was entered into the database as a Holworthy associate, and then later on in '07 as Walnut Park. The reason being is that those individuals who entered him into the database felt that he fit the criteria under the orders."
That other officers had formed the opinion that the defendant fit the criteria does not constitute proper foundation for Merced's opinion; the gang database entry did not provide Merced with underlying facts or data to which he could apply his own expertise. [24]
**468 Cf. Commonwealth v. Avila, 454 Mass. 744, 761-763, 912 N.E.2d 1014 (2009) (substitute medical expert may rely on autopsy report, not to repeat its conclusions, but to apply expertise to "underlying 'facts or data' contained [therein]" [citation omitted] ). Ultimately, Merced was unsure as to who had entered the defendant's name in the database, or what that officer's reasons had been for doing so. There was no testimony regarding how the database is created or maintained, or what criteria police use to determine whose names are entered in it.[25] Cf.
*679 Sullivan, 478 Mass. at 377-378, 85 N.E.3d 934 (admission of testimony regarding deoxyribonucleic acid [DNA] match in Combined DNA Index System database "inadmissible without testimony from those responsible for creating and maintaining the database" under Sixth Amendment and art. 12).
Merced did make several personal observations of the defendant. On one occasion, he suspected that he had observed the defendant participate in a hand-to-hand drug transaction. Police, however, were unable to recover evidence of any drugs, and no charges were brought. Merced was unsure whether the individual seen with the defendant was a member of any gang at the time. On another occasion, Merced had seen the defendant "in the company of ... [a named] known gang member" from Walnut Park. The two were neither stopped nor charged with any unlawful **469 activity.[26] Indeed, to the best of Merced's knowledge, the defendant had never been stopped by police while with a member of the Walnut Park gang:
Q.: "Can you identify, sir, one time, just one time, not simply where he was merely observed with someone, but he was actually stopped by a member of the Boston Police Department, gang or otherwise, that [the defendant] was stopped with another gang member from Walnut Park?"
...
A.: "None that I can recall at this time, no."
That the defendant was observed in the presence of a suspected or actual gang member, even on more than one occasion, does not suffice to support the conclusion that the defendant was, himself, a member of a gang. Contrast Barbosa, 477 Mass. at 668, 81 N.E.3d 293 (witness observed defendant speaking with gang leaders, visiting gang headquarters, and wearing gang colors); Commonwealth v. Cintron, 435 Mass. 509, 521, 759 N.E.2d 700 (2001). We are wary of the "vagaries, circularity, and dangers of trying to prove some kind of guilt by association."[27] See Commonwealth v. Wolcott, 28 Mass. App. Ct. 200, 208, 548 N.E.2d 1271 (1990) (opinion that defendant was member of gang constituted "unacceptable conjecture" where membership "was supported by little more than [the defendant's] use of a street name and his association with [a member of the gang]").[28] Without more, Merced lacked a basis in personal knowledge for concluding that the defendant was a member of the Walnut Park **470 gang. Nonetheless, at the conclusion of the voir dire *680 hearing, he was permitted to testify to that effect.
As the prosecutor noted, the Commonwealth's case depended upon the jury believing that the defendant was a member of the Walnut Park gang. Since Daughtry was not a gang member, the gang rivalry motive could not be established absent evidence of the defendant's gang affiliation. Here, Merced's testimony provided the linchpin. During closing argument, the prosecutor repeatedly drew the jury's attention to the defendant's "gang ties," arguing that the defendant's "association with a gang" implicated him in the crimes, and stating that the "fact" that "the defendant is a Walnut Park gang member" is no "coincidence."
"You heard that the defendant is a member of the Walnut Park gang. That the Boston police have classified him as such. That's uncontroverted fact. What's also uncontroverted fact is that this was a particularly violent rivalry they had with Academy Homes.... Gang members are going to take this personally when there is a shooting on their home turf.... There's your motive. There's your alleged association with a gang."
We have recognized the dangers of liberally attributing gang membership, even in cases where membership in a gang is not central to the Commonwealth's case. See Commonwealth v. Akara, 465 Mass. 245, 267-268, 988 N.E.2d 430 (2013).[29] "Although 'not all gangs are the same and not all gang affiliations are the same,' community attitudes towards gang violence are likely to color [the] evidence." Id., citing Hagedorn & MacLean, Breaking the Frame: Responding to Gang Stereotyping in Capital Cases, 42 U. Mem. L. Rev. 1027, 1029 (2012). Accordingly, "[w]e have urged caution in admitting gang-related evidence," because "evidence of a defendant's gang membership risks prejudice to the defendant in that it may suggest a propensity to criminality or violence." See Akara, supra at 267, 988 N.E.2d 430, quoting **471 Commonwealth v. Phim, 462 Mass. 470, 477, 969 N.E.2d 663 (2012).[30]
In this case, we cannot say that the erroneous admission of the gang expert's opinion had but a slight effect on the jury. Accordingly, the error is itself sufficient to warrant a new trial.
*681 b. Gang activities. Even if Merced's opinion regarding the defendant's gang affiliation were not error, the defendant separately argues that Merced's trial testimony regarding the gangs' prior criminal activities was unduly prejudicial. As this objection was not raised at trial, we review for a substantial likelihood of a miscarriage of justice. See Carriere, 470 Mass. at 8, 18 N.E.3d 326.
i. Prior shootings. Merced testified regarding prior shootings that had taken place between the Academy Homes and Walnut Park gangs. While, ordinarily, evidence of prior bad acts is inadmissible to show a defendant's propensity to commit the crime charged, such evidence may be admitted for another purpose, such as to establish motive. See Commonwealth v. Veiovis, 477 Mass. 472, 481-482, 78 N.E.3d 757 (2017). Where evidence is offered for a nonpropensity purpose, as here, it is admissible if the prejudicial effect does not outweigh the probative value. See Akara, 465 Mass. at 269, 988 N.E.2d 430 ; Commonwealth v. Anestal, 463 Mass. 655, 665, 978 N.E.2d 37 (2012). See also Mass. G. Evid. § 404(b) (2019).
Merced testified that there was a rivalry between the Academy Homes and Walnut Park gangs, and that specific members of the two gangs had been shot, or shot at, in the months leading up to the killing. Evidence of animosity between the gangs was admissible for a nonpropensity purpose; namely, to establish the defendant's motive for committing the crimes. See Phim, 462 Mass. at 477, 969 N.E.2d 663 (evidence of antagonism between gangs relevant). See also Veiovis, 477 Mass. at 481-482, 78 N.E.3d 757. "[W]ithout this evidence, the homicide would have made no sense to the jury." See **472 Commonwealth v. Leng, 463 Mass. 779, 783, 979 N.E.2d 199 (2012). See also Commonwealth v. Smith, 459 Mass. 538, 547, 946 N.E.2d 95 (2011) (no evidence of individual antagonism). There was no clear error of judgment in the judge's determination that the risk of unfair prejudice did not outweigh the probative value of the evidence. See Commonwealth v. Rutherford, 476 Mass. 639, 649, 71 N.E.3d 481 (2017) ; Commonwealth v. Maldonado, 429 Mass. 502, 504, 709 N.E.2d 809 (1999) ("within the discretion of the judge" to admit gang evidence "essential to understanding the motivation behind the crimes").
The judge was required to instruct the jury, however, lest the jury "consider [the] evidence without limitation." See Veiovis, 477 Mass. at 487, 78 N.E.3d 757. In Barbosa, 477 Mass. at 669, 81 N.E.3d 293, we noted with approval that, "[e]ach time the [gang-related] evidence was introduced, it was accompanied by a thorough limiting instruction, which was repeated in the final charge." There, the judge "carefully cabined properly admitted testimony with limiting instructions, voir dire, and exclusion of any references to prior acts of gang-related violence." Id.
Here, by contrast, the judge instructed:
"Evidence that the defendant may have been a member of a gang you may not consider such evidence as evidence that this defendant is of bad character or has or had a propensity to commit the crimes with which he is charged. And such evidence, if you believe it, you may consider only on the limited issues of the defendant's state of mind, motive, and whether he engaged in aiding and abetting another in the commission of the crimes with which he is charged."
In permitting the jury to consider gang affiliation for the broad purpose of determining "whether [the defendant] engaged in aiding and abetting [Daughtry] in the commission of the crimes with which he is *682 charged," the judge placed virtually no limitation on the use of the evidence. Indeed, this "limiting" instruction appears to permit the jury to use the evidence for any purpose relevant to their determination of guilt or innocence.[31] Contrast Akara, 465 Mass. at 266, 268, 988 N.E.2d 430 (limiting gang evidence to "the limited purpose of showing motive and joint venture," that is, "that the defendants therefore shared a common motive"). **473 ii. Other illicit activity. Merced's testimony on direct examination also strayed into other criminal activity in which gangs purportedly were involved. He testified that gangs, generally, were responsible for drug transactions "in schoolyards" and "playgrounds." He attributed to the Walnut Park and Academy Homes gangs a range of criminal activity, including "shootings, drugs, [and] some prostitution." Merced also stated that the rivalry between Walnut Park and Academy Homes was responsible for "unsolved shootings."[32] He said that "gang members oftentimes have access to guns," sometimes giving them to a "non-gang member," "[c]ommonly referred to as a crash dummy" or "human holster." Other times, gang members hide a "community gun," which is a "gun where all the gang members in that particular jurisdiction will know where that gun may be hidden."[33]
In totality, the gang-related testimony went well beyond that which was probative of the facts at issue: the rivalry between the Walnut Park and Academy Homes gangs, which might have given the defendant a motive to kill. Contrast Akara, 465 Mass. at 267-269, 988 N.E.2d 430 ("The prosecutor did not suggest that the gang or its members had a history of violence" and "did not discuss any criminal activity"; "rather, the emphasis was on common identifying symbols, reflected in graffiti and clothing"); Commonwealth v. John, 442 Mass. 329, 338 n.14, 812 N.E.2d 1218 (2004) (gang testimony sanitized so that "[t]he only evidence of [defendant's] violence presented at trial was the murder of [victim]"). The judge gave no curative instructions with respect to the testimony concerning drug activity, sex trafficking, or community guns. Accordingly, the jury could have taken Merced's testimony to mean that the defendant was engaged in the drug trade, the sex trade, and numerous "unsolved" shootings.
We need not reach what effect, if any, this additional gang-related evidence might have had on the jury in the absence of Merced's opinion that the defendant was a member of a gang. It suffices that, in light of the other prejudicial errors, a new trial is required, at which the aforementioned testimony will not be admitted.
**474 3. Video identification. The defendant argues that the testimony of four Boston police officers, who identified him as the individual depicted in the surveillance videotape (video), was improper and unduly prejudicial. Where, as here, the issue was not preserved, we review for a substantial *683 likelihood of a miscarriage of justice. See Carriere, 470 Mass. at 8, 158" url="https://cite.case.law/citations/?q=18%20N.E.3d%20326">18 N.E.3d 326.
a. Police testimony. The jury viewed surveillance footage from the night of the shooting that showed two individuals walking down the middle of the street, apparently shooting in the direction of a house, and then running back the way they had come. The black and white footage is grainy, and both individuals have their hoods up. The Commonwealth elicited testimony from four Boston police officers describing what was depicted in the surveillance footage, and portions of the footage were played multiple times during that testimony.
Before the jury were shown the surveillance video recording, Teahan opined that the people shown were dressed "similar to the way the two individuals [he] had stopped, [the defendant] and ... Daughtry." He also described the articles of clothing the individuals depicted in the video footage were wearing.[34] The prosecutor emphasized that the officer had watched the recording "four or five times" while looking for "similarities in clothing." The officer testified that it was "readily apparent that the clothing descriptions of the individuals [he] had stopped and the clothing descriptions within the video were almost -- looked exact to [him]." He then described the differences in height and stature of the two men, and the color of the shoes one was wearing, which the officer said matched the shoes the defendant had been wearing when stopped. The prosecutor also introduced photographs of the defendant, with arrows pointing to the "points of comparison [Teahan] used when looking at the video." Teahan testified that he was "struck by the fact that you could see that same similarity."
Detective John Callahan also described the clothing, height, and handedness of the individuals depicted in the surveillance video footage. He opined that, upon seeing the defendant and Daughtry, "I observed that their attire matched, was a definitive match to that of what I saw in the video earlier in the evening." Sergeant John Fitzgerald then testified that he watched the video "over and over"; "repeated[ly]." Fitzgerald went to see the defendant **475 and Daughtry, to "see if they resemble the two people in the video"; he concluded that, with respect to the defendant, he "appeared to be the same person from the video," and that the clothing worn by Daughtry "appeared to match the person on the video" as well. Lastly, Detective Dennis Harris was asked to make comparisons between the appearance of the defendant and Daughtry and the individuals depicted in the video footage. He opined that "they had identical clothing on." He then reviewed side-by-side comparisons of a still image from the surveillance video recording and a photograph taken at the police station, and noted the similarities between the two.
b. Improper lay opinion. "Making a determination of the identity of a person from a photograph or video image is an expression of an opinion." Commonwealth v. Pina, 481 Mass. 413, 429, 116 N.E.3d 575 (2019). When offered by a lay witness, such an opinion is admissible only where "the subject matter to which the testimony relates cannot be reproduced or described to the jury precisely as it appeared to the witness at the time" (citation omitted). See Commonwealth v. Austin, 421 Mass. 357, 366, 657 N.E.2d 458 (1995). The purpose of a lay witness identification is to "assist the jurors in making their own independent identification."
*684 Pina, supra. See Mass. G. Evid. § 701 (2019). Lay witness identifications are admissible, therefore, "when the witness possesses sufficiently relevant familiarity with the defendant that the jury cannot also possess." See Commonwealth v. Vacher, 469 Mass. 425, 441, 14 N.E.3d 264 (2014), quoting Commonwealth v. Pleas, 49 Mass. App. Ct. 321, 326-327, 729 N.E.2d 642 (2000). "If the witness lacks such familiarity, it is the province of the jury to draw their own conclusions regarding the identity of the person depicted without the witness's assistance." Vacher, supra. Even where a witness is familiar with a defendant, his or her testimony is not admissible where "the witness is no better-suited than the jury to make the identification." See United States v. Jackman, 48 F.3d 1, 4-5 (1st Cir. 1995). See also Austin, supra.
Here, the jury were able to view the same surveillance footage that the officers watched. So, too, the jury were able to examine the appearance of the defendant on the night of the shooting, including the clothing he was wearing. Photographs of the defendant taken that night, as well as the clothing itself, were introduced in evidence. There was no evidence that the defendant's appearance had changed substantially between the time the video recording was made and the time the photographs were taken, on **476 the same evening. Nor were any of the four officers who offered opinions regarding the surveillance footage specifically familiar with the defendant, such that they could provide special insight into his appearance.[35] See Vacher, 469 Mass. at 442, 14 N.E.3d 264. Contrast Commonwealth v. Vitello, 376 Mass. 426, 460, 381 N.E.2d 582 (1978) (defendant had lost twenty-five pounds since photograph was taken, and officer had known defendant for long time and seen him often).
In short, "[t]he jury were capable of viewing the videotape and drawing their own conclusions regarding whether the man in the videotape was the defendant without the assistance of [the witness's] testimony." See Austin, 421 Mass. at 366, 657 N.E.2d 458. See also United States v. Vázquez-Rivera, 665 F.3d 351, 361 (1st Cir. 2011) ("Crucially, because the determination of whether [defendant] was the man in the [Internet camera] video could have been properly reached only by considering evidence available to the jury, [officer's] testimony also usurped the jury's role instead of being helpful to it"). It was the province of the jury, and not the officers, to determine whether the defendant "appeared to be the same person from the video," or whether "their attire matched, was a definitive match."
We have recognized the "increase[d] potential for inappropriate prejudice to the defendant stemming from identification testimony from a police officer who is so designated" (quotations omitted). See Vacher, 469 Mass. at 442, 14 N.E.3d 264, quoting Commonwealth v. Carr, 464 Mass. 855, 879, 986 N.E.2d 380 (2013). Nonetheless, we also have determined that there was no prejudice in the admission of improper lay witness identifications where the improper testimony was "brief and fleeting" and the defendant otherwise admitted having been present at the scene. See, e.g., Vacher, supra. See also Pina, 481 Mass. at 430, 116 N.E.3d 575 (four witnesses identified defendant at scene).
The improper identification evidence here was extensive. It was elicited not once, but from four individual officers, and it was supplemented with side-by-side photographs detailing points of comparison relied upon by the officers. Crucially, the *685 evidence was not collateral; identification was at the heart of the Commonwealth's case. Indeed, the prosecutor spent much of her closing arguing that there was sufficient evidence to identify the man in the video footage as the defendant. Faced with the opinions of **477 four officers imbued with the imprimatur of authority and privy to repeated viewings of the surveillance footage, a juror well might have substituted the officers' opinions for his or her own.
c. Substantially more prejudicial than probative. Even had the officers' testimony constituted proper lay opinions, it nonetheless was substantially more prejudicial than it was probative. See Pleas, 49 Mass. App. Ct. at 327, 729 N.E.2d 642 (applying balancing test even where lay witness identification otherwise is admissible); Mass. G. Evid. § 403 (2019). Having established that the officers had viewed the surveillance footage, there was minimal probative value in their testimony as to what they saw depicted therein, which the jury could see for themselves.
The risk of prejudice, by contrast, was great. As this court has recognized, identification testimony from a police officer risks bringing with it a "greater imprint of authority." Pina, 481 Mass. at 430, 116 N.E.3d 575. "The usurpation problem that arises when a witness testifies to opinions based on evidence that was also available to the jurors is compounded when the witness is a government agent whose testimony -- as here -- is effectively a judgment on the question of guilt or innocence." United States v. Meises, 645 F.3d 5, 17 (1st Cir. 2011). In addition, here the prosecutor elicited that the officers had viewed the video footage "four or five times," "over and over," and "repeated[ly]," suggesting that their opinions concerning its contents merited greater weight than that of the jurors. Moreover, immediately before the jury were shown the footage for the first time, Teahan testified that the figures the jurors were about to see in the video recording were dressed similarly to the way the defendant and Daughtry had been dressed. Such priming risked creating a cognitive bias before the jurors saw the footage for the first time, particularly where the recording was of poor quality.[36]
Because we determine that the introduction of the improper and unduly prejudicial identifications was "likely to have influenced the jury's conclusion," a new trial is required. See Berry, 457 Mass. at 618, 931 N.E.2d 972.
d. Bowden defense. On appeal, the Commonwealth argues that the foregoing identification by the four police officers was offered **478 to rebut a Bowden defense. See Commonwealth v. Bowden, 379 Mass. 472, 486, 399 N.E.2d 482 (1980). Where a defendant raises a Bowden defense, the Commonwealth may offer "testimony about why the investigators chose the particular investigative path they did," in order to rebut that defense. See Avila, 454 Mass. at 755, 912 N.E.2d 1014. That a defendant has called into question the thoroughness of a police investigation, however, does not provide carte blanche to introduce all conceivable rebuttal evidence. Rather, the scope of permissible rebuttal evidence must be proportionate to the defense raised; "the more wide-ranging the defendant's attack on the police investigation, the broader the Commonwealth's response *686 may be." Id. at 754-755, 912 N.E.2d 1014. See Commonwealth v. Bizanowicz, 459 Mass. 400, 414, 945 N.E.2d 356 (2011) (before allowing admission of Bowden evidence, judge must balance probative value against risk of prejudice). "[D]etermining precisely what evidence may be admitted to rebut a Bowden defense is a delicate and difficult task." Avila, supra at 753, 912 N.E.2d 1014.
It is not clear from the record that a Bowden defense was meaningfully raised. In any event, the judge did not instruct the jury that the officers' identification testimony was admissible only for the limited purpose of rebutting a Bowden argument.[37] Contrast Avila, 454 Mass. at 755-756, 912 N.E.2d 1014 ("judge repeatedly instructed the jury that the investigators' testimony ... was presented to enable the jury to evaluate the police"). The jurors had access to the video recording and could determine for themselves whether an officer, having reviewed it, acted appropriately in pursuing the defendant as the target of the investigation. The officers' opinions that the individual in the recording was a "definitive match" to the defendant were neither pertinent nor necessary to rebut a Bowden defense.
4. Closing argument . The defendant contends that the prosecutor engaged in improper argument and vouching during her closing. The prosecutor argued,
"And so, too, when I present this evidence to you, there is two years' worth of investigation; that [eighty-four] witnesses, **479 the list of names you heard when you were still in the jury pool, those [eighty-four] witnesses, I need to make judgment calls. I need to exercise my discretion. I need to decide to present to you what is admissible and what is relevant. And from that you heard from [twenty-seven] witnesses over eight days and [eighty-nine] exhibits. That's what I'm asking you to focus on, ladies and gentlemen."
Among several limitations on closing argument, see 30A E.B. Cypher, Criminal Practice and Procedure §§ 36:16-36:41 (4th ed. 2014), it is improper for an attorney to "imply that [he or she] knew more about the case than he [or she] had presented in court."[38] See Commonwealth v. Dinkins, 415 Mass. 715, 725, 615 N.E.2d 570 (1993). See also Mass. G. Evid. § 1113(b) (2019). The prosecutor's argument here, that she was aware of up to "[eighty-four] witnesses" who would have been useful to proving the defendant's guilt, but whom she was unable to call, was a clear violation of this principle. Such argument impermissibly asks the jury to "speculate" or "imagine" additional evidence not before them. See Commonwealth v. Corriveau, 396 Mass. 319, 339, 486 N.E.2d 29 (1985).
Additionally, the prosecutor in effect attributed her inability to call missing witnesses to constraints regarding "what is admissible and what is relevant." Counsel may not "invite an inference from the exercise of a party's right to have *687 evidence excluded." See Commonwealth v. Burke, 373 Mass. 569, 575, 369 N.E.2d 451 (1977). See also Berger v. United States, 295 U.S. 78, 87, 55 S.Ct. 629, 79 L.Ed. 1314 (1935) (attorney impermissibly argued he had to "play within" "rules of the game"). Attorneys are explicitly barred from arguing that they would have been able to "parade witness after witness" into court, but for evidentiary limitations.[39] See Commonwealth v. Dirgo, 474 Mass. 1012, 1016, 52 N.E.3d 160 (2016). See also United States v. Walker-Couvertier, 860 F.3d 1, 10 (1st Cir. 2017), cert. denied, --- U.S. ----, 138 S. Ct. 1303, 200 L.Ed.2d 487 and --- U.S. ----, 138 S. Ct. 1339, 200 L.Ed.2d 523 (2018) (government argued it could **480 have put on "two months" of evidence and "boatloads" of evidence); State v. Ranicke, 3 Wash. App. 892, 897, 479 P.2d 135 (1970) (government argued it "could have called 200 witnesses").
In some cases, violation of these principles constitutes grounds for reversal. See Dirgo, 474 Mass. at 1016-1017, 52 N.E.3d 160 (new trial ordered, notwithstanding lack of objection at trial, where judge did not give "strong curative instructions" and evidence was not "overwhelming"). See also Burke, 373 Mass. at 575, 369 N.E.2d 451 (multiple errors in closing argument). Here, however, the improper argument played a relatively minor role in the prosecutor's remarks. We need not determine whether this unpreserved error, alone, gave rise to a substantial likelihood of a miscarriage of justice, as we conclude that, in combination with the aforementioned errors, a new trial is required. In any event, the prosecutor's argument went beyond that which is acceptable, a practice that should not be repeated at any new trial.[40]
5. Motion to suppress. Prior to trial, the defendant moved to suppress several statements he made to police. He argued that, as to his earlier statements, he was not given Miranda warnings and, as to his later statements, the Commonwealth lacked probable cause for his arrest. When reviewing the denial of a motion to suppress, we accept the judge's findings of fact absent clear error and "make an independent determination of the correctness of the judge's application of constitutional principles to the facts as found." Commonwealth v. Pridgett, 481 Mass. 437, 439, 116 N.E.3d 549 (2019), quoting Commonwealth v. Tremblay, 460 Mass. 199, 205, 950 N.E.2d 421 (2011).
a. Miranda warnings. Police first questioned the defendant on the street, fifty minutes after the shooting. They did not read Miranda warnings prior to speaking with the defendant.
Miranda warnings are required before police conduct a custodial interrogation. See *688 Commonwealth v. Morse, 427 Mass. 117, 122-123, 691 N.E.2d 566 (1998). A custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken **481 into custody or otherwise deprived of his freedom of action in any significant way." Commonwealth v. Jung, 420 Mass. 675, 688, 651 N.E.2d 1211 (1995), quoting Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The defendant bears the burden of showing that the interrogation was custodial. Commonwealth v. Larkin, 429 Mass. 426, 432, 708 N.E.2d 674 (1999). To determine whether an interrogation was custodial, we ask whether a reasonable person in the defendant's shoes would have perceived the environment as coercive. See Commonwealth v. Kirwan, 448 Mass. 304, 309, 860 N.E.2d 931 (2007).
In making this determination, we consider four factors: "(1) the place of the interrogation; (2) whether the officers have conveyed to the person being questioned any belief or opinion that that person is a suspect; (3) the nature of the interrogation, including whether the interview was aggressive or, instead, informal and influenced in its contours by the person being interviewed; and (4) whether, at the time the incriminating statement was made, the person was free to end the interview by leaving the locus of the interrogation or by asking the interrogator to leave, as evidenced by whether the interview terminated with an arrest." Commonwealth v. Groome, 435 Mass. 201, 211-212, 755 N.E.2d 1224 (2001). No single factor is dispositive. See Kirwan, 448 Mass. at 309, 860 N.E.2d 931.
The motion judge found that the interrogation took place on a public street. The defendant was not handcuffed, although he had been separated from Daughtry. See Commonwealth v. Cawthron, 479 Mass. 612, 618-619, 97 N.E.3d 671 (2018) (police separately questioned two suspects in public parking lot without physical restraints; we determined that atmosphere was not "inherently coercive"). The officer conducting the questioning did not accuse the defendant of shooting the victim or otherwise suggest that the defendant was a suspect. Compare ibr.US_Case_Law.Schema.Case_Body:v1">id. at 620, 97 N.E.3d 671 (officers did not tell defendants they were suspects). See Groome, 435 Mass. at 212 n.13, 755 N.E.2d 1224. (officer's "unarticulated suspicion[ ] contribute[d] nothing to the objective circumstances of the encounter"). The officer's tone was "conversational" and he "did not raise his voice" when asking the defendant about the defendant's whereabouts. "[N]othing in the record suggests that [the officers] were 'aggressive,' 'persistent,' or 'harsh,' which would support a conclusion that the defendant[ ] had been subject to a custodial interrogation." Cawthron, supra at 621, 97 N.E.3d 671, quoting **482 Commonwealth v. Coleman, 49 Mass. App. Ct. 150, 155, 727 N.E.2d 103 (2000).[41]
As to the final Groome factor, however, the defendant was questioned for at least twenty minutes, while officers attempted to verify his statement and reviewed security footage. The interrogation ended with the defendant being handcuffed and transported to police headquarters. "An arrest after an incriminating statement has been obtained, by itself, [does not] label[ ] as custodial the interrogation that precedes the incriminating statement" (quotation and citation omitted). Cawthron, 479 Mass. at 622, 97 N.E.3d 671. Rather, we must weigh the *689 factors in their totality. See id. at 622-623, 97 N.E.3d 671.
This case is similar to Cawthron, 479 Mass. at 624, 97 N.E.3d 671, in which defendants were "subject to a minimal detention when officers asked them to move a few yards; the detectives conducted a very preliminary investigation." On the whole, the officer's questioning "was generally of a fact-finding nature, intended to verify or dispel a reasonable suspicion of criminal activity, for which Miranda warnings are not required." Compare Kirwan, 448 Mass. at 311, 860 N.E.2d 931. At the point at which the defendant here made preliminary statements to the officers regarding his prior whereabouts, the interrogation was not yet custodial.[42]
b. Probable cause. The defendant also maintains that police lacked probable cause to arrest him. "Probable cause to arrest exists when, at the moment of arrest, the facts and circumstances within the knowledge of the police are enough to warrant a prudent person in believing that the individual arrested has committed or was committing an offense" (quotation and citation omitted). Pridgett, 481 Mass. at 439, 116 N.E.3d 549. Probable cause requires "more than a suspicion of criminal involvement, something definite and substantial, but not a prima facie case of the commission of a crime, let alone a case beyond a reasonable doubt" (citation omitted). Commonwealth v. Santaliz, 413 Mass. 238, 241, 596 N.E.2d 337 (1992).
The defendant argues, essentially, that he was arrested for wearing a hooded sweatshirt, as an African-American male, and **483 for becoming startled in the presence of a police officer. See Commonwealth v. Warren, 475 Mass. 530, 535, 58 N.E.3d 333 (2016) (description of African-American man wearing "red hoodie" "contribute[d] nothing to the officers' ability to distinguish the defendant from any other black male wearing dark clothes and a hoodie" [quotations and citation omitted] ). Cf. id. at 540, 58 N.E.3d 333 ("the finding that black males in Boston are disproportionately and repeatedly targeted for [field interrogation observation] encounters suggests a reason for flight totally unrelated to consciousness of guilt"). We do not agree with the defendant, however, that these were the bases of his arrest.
Officers found the defendant and Daughtry together. The two men were about one-half mile from the scene of the shooting, less than one hour after the shooting. The clothing of both men matched the descriptions given by witnesses and confirmed by surveillance video footage. The men were similar in relative height and relative weight to the individuals depicted on the surveillance footage. Moreover, the shooting had occurred in one gang's territory, and police found the defendant and Daughtry in the territory of a rival gang. One officer had reason to believe that the defendant was a member of that rival gang. Perhaps most importantly, the defendant provided an account of where he had been in the afternoon and late evening. His account not only contradicted Daughtry's statements, but police attempts to verify the defendant's statements were unsuccessful. When police knocked on the door of the apartment from which the defendant claimed to have come, the occupant replied that he had not had any visitors and was not the man the defendant claimed him to be.
*690 Taken together, the information known to the police at the time was sufficient to establish probable cause to arrest the defendant. Accordingly, there was no error in the denial of the defendant's motion to suppress.
Conclusion. "Where there has been an error in a trial resulting in a conviction of murder in the first degree, a new trial is called for unless we are substantially confident that, if the error had not been made, the jury verdict would have been the same" (quotation and citation omitted). Commonwealth v. Tavares, 471 Mass. 430, 441, 30 N.E.3d 91 (2015). Because we are not "substantially confident" that the jury verdicts would have been the same absent these **484 errors, the verdicts are vacated and set aside, and the matter is remanded to the Superior Court for a new trial.
So ordered.

In a separate trial, Daughtry was acquitted of all charges.

The accounts differed as to which guns were fired. Whereas two witnesses reported that flashes came from both guns, the Commonwealth's theory at trial was that only Daughtry's gun fired, while the defendant's jammed. This explained the presence of a dislodged round of live ammunition on the street and the absence of gunshot residue on the defendant's hands.

The defendant was then eighteen years old, and Daughtry was twenty-seven.

No guns were found.

The defendant is five feet, eleven inches tall and weighed approximately 150 pounds at the time; Daughtry is six feet tall and weighed approximately 180 pounds.

Daughtry's statements were admitted, over objection, as statements of a joint venturer.

To the extent that the defendant argues that the judge also erred in permitting the jury to learn that Daughtry made additional statements to police, the argument is without merit. The jury were not privy to the contents of Daughtry's further statements, only to the fact that statements had been made.

We previously have determined that art. 12 of the Massachusetts Declaration of Rights is coextensive with the Sixth Amendment to the United States Constitution with respect to questions of hearsay. See Commonwealth v. DeOliveira, 447 Mass. 56, 57 n.1, 849 N.E.2d 218 (2006).

Statements admitted under this exemption are entered for their truth. See Commonwealth v. Holley, 478 Mass. 508, 534, 87 N.E.3d 77 (2017) ; Commonwealth v. Veiovis, 477 Mass. 472, 480 n.8, 78 N.E.3d 757 (2017).

We assume, without deciding, that the Commonwealth presented sufficient evidence to demonstrate that the defendant and Daughtry were engaged in a joint venture.

We have "expressed skepticism that disclosing the circumstances of a crime to a third party can be considered to be in furtherance of the crime disclosed." See Commonwealth v. Rakes, 478 Mass. 22, 40, 82 N.E.3d 403 (2017), and cases cited. One exception would be cases in which a coventurer sought a third party's assistance in covering up the crime or evading capture. See, e.g., Commonwealth v. Colon-Cruz, 408 Mass. 533, 544, 562 N.E.2d 797 (1990). Likewise, where coventurers attempt to silence witnesses after a crime, we generally consider those attempts to be a continuation of the joint venture. See, e.g., Rakes, supra at 39, 82 N.E.3d 403 ; Commonwealth v. Wood, 469 Mass. 266, 281, 14 N.E.3d 140 (2014) ; Commonwealth v. Bright, 463 Mass. 421, 436, 974 N.E.2d 1092 (2012).

The Commonwealth makes much of the fact that the defendant and Daughtry spoke about their conversations with police after Daughtry's first statement and before his second. If anything, Daughtry's interests became less aligned with the defendant after this encounter; in his second statement, Daughtry further implicated the defendant, describing the defendant and "Dee" as wearing clothing that matched that of the perpetrators.

We note that Daughtry had been handcuffed and transported to police headquarters prior to making his second statement. "[D]eclarations of the usual sort by a coventurer after he has been apprehended or arrested, admitting the crime or implicating another, while they may be admissible against himself, do not fall within the [joint venture] hearsay exception and cannot be offered against another coventurer to prove the matters asserted." Commonwealth v. White, 370 Mass. 703, 710, 352 N.E.2d 904 (1976).

At Daughtry's trial, a Superior Court judge denied the Commonwealth's motion to introduce the defendant's statements against Daughtry, under a joint venture theory. That judge concluded that the Commonwealth had "not shown that the statements were made during the pendency of the joint venture nor that the statements were made in an effort to conceal the crime." He also found that "the statements of [the defendant] [were] not properly attributable to Daughtry as consciousness of guilt evidence."

This situation differs from that in which two contradictory statements come from a single declarant. In such a case, the declarant must have lied -- either in making the earlier statement, or in making the latter. Where, as here, the declarants are two different people, the fact of contradiction does not suggest which declarant lied.

" 'Acts of a joint venturer amounting to consciousness of guilt may be attributed to another joint venturer if the acts occurred during the course of a joint venture and in furtherance of it.' Commonwealth v. Mahoney, 405 Mass. 326, 330-331, 540 N.E.2d 179 (1989). Cf. Commonwealth v. Andrews, 403 Mass. 441, 452, 530 N.E.2d 1222 (1988) (if joint venture has ended, subsequent actions of joint venturer cannot be admitted against another)." Commonwealth v. Braley, 449 Mass. 316, 322, 867 N.E.2d 743 (2007).

By comparison, where other evidence was admitted "not for the truth," the judge instructed the jury to that effect, and offered further guidance when the jury required clarification.

Before the United State Supreme Court's decision in Michigan v. Bryant, 562 U.S. 344, 358, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011), we applied a two-part test to determine whether a statement was testimonial. We examined, first, whether a statement was "per se testimonial," and, if not, whether "a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting a crime." See Commonwealth v. Gonsalves, 445 Mass. 1, 3, 833 N.E.2d 549 (2005), cert. denied, 548 U.S. 926, 126 S.Ct. 2980, 165 L.Ed.2d 990 (2006).
Following that decision, however, we recognized that the "touchstone of the confrontation clause analysis" is the "primary purpose" of the statement. See Commonwealth v. Middlemiss, 465 Mass. 627, 634, 989 N.E.2d 871 (2013). See also Commonwealth v. Imbert, 479 Mass. 575, 580, 97 N.E.3d 335 (2018) ; Commonwealth v. Beatrice, 460 Mass. 255, 259-264, 951 N.E.2d 26 (2011). While, on occasion, we continued to apply the two-step analysis from Gonsalves, 445 Mass. at 3, 833 N.E.2d 549, see, e.g., Commonwealth v. Celester, 473 Mass. 553, 562-563, 45 N.E.3d 539 (2016) ; Commonwealth v. Cole, 473 Mass. 317, 329-330, 41 N.E.3d 1073 (2015) ; Commonwealth v. Cheremond, 461 Mass. 397, 411, 961 N.E.2d 97 (2012), we take this opportunity to clarify that the appropriate method of analysis is the "primary purpose" test. Accordingly, statements made in response to police interrogation are not "testimonial per se," although they will qualify as testimonial in many cases, as they do here. See Ohio v. Clark, --- U.S. ----, 135 S. Ct. 2173, 2181, 192 L.Ed.2d 306 (2015) (statements to police are more likely to be testimonial than statements to other individuals).

Nor do the statements avoid scrutiny under the Sixth Amendment by virtue of having been made by a coventurer. See Commonwealth v. Carriere, 470 Mass. 1, 9, 18 N.E.3d 326 (2014) (statements of joint venturer made in furtherance of joint venture generally are not testimonial). As discussed, Daughtry's statements were not made in furtherance of a joint venture.

The Sixth Amendment does not bar testimonial statements offered for a nontruth purpose. See Crawford v. Washington, 541 U.S. 36, 59 n.9, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Even had Daughtry's statements been so admitted, however, the inculpatory nature of the statements might have posed a risk of unfair prejudice to the defendant. Cf. Bruton v. United States, 391 U.S. 123, 125-126, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (codefendant's inculpation of defendant creates substantial risk of prejudice, which cannot be overcome by jury instructions).

Where, as here, the judge gave no limiting instruction to the contrary, we cannot assume that the jury did not consider the statement for its truth. See Commonwealth v. Caillot, 454 Mass. 245, 255-256, 909 N.E.2d 1 (2009), cert. denied, 559 U.S. 948, 130 S.Ct. 1527, 176 L.Ed.2d 128 (2010). Cf. Commonwealth v. Crayton, 470 Mass. 228, 251, 21 N.E.3d 157 (2014) ("We generally presume that a jury understand and follow limiting instructions ..." [quotation and citation omitted] ).

The judge grappled with Detective Sixto Merced's lack of personal knowledge; he noted that "there has to be some amount of evidence that is based on personal observation of the testifying witness with regard to the defendant, and it's that quantum of information that I'm struggling with."

Although "other gang members" had identified themselves to Merced as being affiliated with a particular gang, he was not personally familiar with anyone who self-identified as a member of the Walnut Park gang.

To the extent that the gang database contained factual observations reported by other officers, Merced was not familiar with them. To the extent that the database contained opinions, these were not independently admissible. See Julian v. Randazzo, 380 Mass. 391, 393, 403 N.E.2d 931 (1980) (police reports containing officer's conclusions or recommendations inadmissible as hearsay). See also Mass. G. Evid. § 803(6)(A) note (2019) (business record hearsay exception for police reports "applies only to factual observations and does not permit the admission of opinions contained in the report").

The judge excluded any mention of a gang "database" from testimony. To the extent that Merced's opinion regarding the defendant's gang membership was a reiteration of the gang database entry, however, it implicated the defendant's right to confront the officers who formed that opinion. See United States v. Ramos-González, 664 F.3d 1, 5 (1st Cir. 2011), quoting United States v. Ayala, 601 F.3d 256, 275 (4th Cir.), cert. denied, 562 U.S. 910, 131 S.Ct. 262, 178 L.Ed.2d 173 (2010) (inquiry is whether "expert is, in essence, [giving an independent judgment or] merely acting as a transmitter for testimonial hearsay"). See also United States v. Mejia, 545 F.3d 179, 197 (2d Cir. 2008) (expert may not simply "repeat[ ] hearsay evidence without applying any expertise whatsoever" [citation omitted] ); Seaman, Triangulating Testimonial Hearsay: The Constitutional Boundaries of Expert Opinion Testimony, 96 Geo. L.J. 827, 880 (2008).

Merced also was aware of reports, written by other officers, stating that the defendant had twice been seen with a man believed to be an associate of the Walnut Park gang. In one instance, the men were observed together. In the other instance, the two were seen in the proximity of an area from which a gun was recovered. Neither man was charged in connection with the firearm, nor was the defendant stopped or questioned by police in connection with any crime.

Similarly, the Commonwealth's contention that Merced could surmise the defendant's gang membership because shootings had occurred in the defendant's neighborhood is unavailing. One need not be a gang member to be present for, or the victim of, a shooting. As the Commonwealth argued at trial, individuals may be present during a shooting, "not because of anything they did but only because of where they lived."

Nor is it sufficient that, on one occasion, another officer found cocaine in the proximity of the defendant. The presence of "some crack cocaine" in a discarded pair of pants does not itself indicate gang membership. Merced's suggestion that possession is "consistent" with gang membership because "the distribution of narcotics ... [could] further the income of the gang" is speculative at best.

See also See Eisen, Dotson, & Dohi, Probative or Prejudicial: Can Gang Evidence Trump Reasonable Doubt?, 62 UCLA L. Rev. Discourse 2, 13-14 (2014) (jurors in study attributed assessment of defendant's guilt to "gang affiliation" or "criminal background," even where only evidence of criminal activity was fact of gang membership); Eisen, Gomes, Wandry, Drachman, Clemente, & Groskopf, Examining the Prejudicial Effects of Gang Evidence on Jurors, 13 J. Forensic Psychol. Prac. 1, 11-12 (Jan. 2013) (fact that defendant spent time with gang members or had gang tattoo significantly increased rate at which jurors in study voted to convict).

To this end, where there is sufficient foundation to allow introduction of an opinion on gang affiliation, it is appropriate to instruct the jury regarding the admission of such evidence for "the limited purpose of showing motive and joint venture." See, e.g., Commonwealth v. Akara, 465 Mass. 245, 266, 988 N.E.2d 430 (2013). In such cases, we permit the jury to consider the gang affiliations of two or more codefendants for the proposition "that the defendants therefore shared a common motive," as may be the case where codefendants are members of one gang and the victim is a member of a rival gang. See id. at 268, 988 N.E.2d 430. See also Commonwealth v. Smith, 450 Mass. 395, 399, 879 N.E.2d 87, cert. denied, 555 U.S. 893, 129 S.Ct. 202, 172 L.Ed.2d 161 (2008) ; Commonwealth v. Swafford, 441 Mass. 329, 332, 805 N.E.2d 931 (2004) ; Commonwealth v. Smiley, 431 Mass. 477, 484, 727 N.E.2d 1182 (2000). As discussed infra, the instruction in this case was overbroad, permitting the jury to consider the evidence for virtually any purpose.

Should the judge at retrial again determine that the risk of unfair prejudice from the testimony regarding prior shootings that had taken place between the two gangs does not outweigh the probative value of that evidence, and that it is admissible, the judge must instruct the jury carefully and at the appropriate times (including in the final charge) on the limited use of such evidence.

Merced's basis for this opinion is unclear, as an "unsolved" shooting, by definition, cannot be attributed to a particular perpetrator. See Mass. G. Evid. §§ 702(b), 703 (2019) (requiring sufficient facts and data for expert opinions).

An objection to this definition of a "community gun" was sustained, although the testimony was not explicitly struck, nor were the jury explicitly instructed to disregard it.

At this point, the jury were first shown the surveillance footage, which they saw again multiple times during the other officers' testimony.

While Merced testified that he had known the defendant for several years, he was not one of the officers who opined as to the identity of the individual in the video footage.

See Yakren, Removing the Malice from Federal "Malicious Prosecution": What Cognitive Science Can Teach Lawyers About Reform, 50 Harv. C.R.-C.L. L. Rev. 359, 382 (Summer 2015). See also Dror & Charlton, Why Experts Make Errors, 56 J. Forensic Identification, no. 4, 2006, at 600-616 (discussing effects of cognitive bias on forensic analysis).

During the testimony, the judge gave a limiting instruction regarding the use of one of Detective John Callahan's answers: "[Y]ou may consider it ... only as you find it goes to this individual officer's decision to take or not to take certain action." That instruction, however, was in response to an earlier portion of Callahan's testimony, and the judge ultimately reversed his decision and struck the related answer. The judge did not give a limiting instruction on the subsequent testimony regarding video identification.

Although the judge mentioned eighty-four names of potential witnesses to the venire during empanelment, a judge's questions during voir dire are not evidence. "Closing argument must be based on the evidence and the fair inferences from the evidence." Mass. G. Evid. § 1113(b) (2019).

"A prosecutor must not suggest that additional inculpatory evidence exists that was not presented at trial because of legal rules, trial tactics, administrative convenience, or defense objections. Such insinuations invite the jury to speculate about such phantom proof, and may be even more prejudicial than erroneously admitted specific proof." B.L. Gershman, Prosecutorial Misconduct § 11:29 (2d ed. Aug. 2018 update).

Because of the result we reach, we do not address the remainder of the defendant's arguments, except to note that several concern asserted ineffective assistance of counsel. As with the defendant's arguments as to the denial of his motion for expert funds and motion for an evidentiary hearing, as it relates to his motion for a new trial, such claims are now moot. Cf. Commonwealth v. Clary, 388 Mass. 583, 595, 447 N.E.2d 1217 (1983) ("We do not anticipate that [these issues] ... will arise at a new trial of this case, and for that reason there is no necessity to discuss [them] here").

Although they displayed their badges, the officers wore plain clothes and approached in an unmarked vehicle. No evidence was presented that the officers displayed their weapons.

When the officers discovered additional evidence implicating the defendant (i.e., the surveillance video recording), they properly ceased questioning. At that point, they placed the defendant in custody and transported him to the police station. There, they read him the Miranda warnings before proceeding with a formal interrogation.