NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-1209

COMMONWEALTH

vs.

LINK L., a juvenile.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The juvenile was adjudicated delinquent after a jury found him delinquent of various firearm offenses, resisting arrest, and vandalism.[1]  The jury also found the juvenile guilty on two counts of carrying a firearm without a license for which he was adjudicated a youthful offender.  On appeal, the juvenile claims that his attorney provided him with ineffective assistance of counsel during his opening statement, a police witness

---

[1] The firearm offenses underlying the delinquency adjudications consist of:  discharge of a firearm within 500 feet of a building, carrying a firearm in the commission of a felony, carrying a loaded firearm without a license, and possession of a large capacity firearm.  The juvenile was also charged with possession of ammunition without a firearm identification card and, at trial, the judge allowed a required finding of not guilty on that charge.

improperly identified him from surveillance video footage and photographs, the judge improperly instructed the jury on consciousness of guilt, and the sentence imposed on one of the two youthful offender adjudications was unlawful.  We affirm.

Background.  We summarize the facts as the jury could have found them, reserving certain facts for later discussion.  At approximately 11:30 P.M., on February 15, 2022, multiple shots were fired at a three-apartment, three-floor residential house. A resident of the second-floor apartment called 911.  When police officers arrived, they saw bullet holes in various parts of the second and third floor apartments and found approximately forty-one shell casings on the street in front of the building. The house had a security system with a camera that recorded the incident.  Soon after the shooting, Detective Alexander Ovalles, one of the detectives that investigated the shooting, obtained video footage from that camera and also surveillance video footage from nearby residences and businesses.  Segments of the video footage (video clips) were shown to the jury.  They depicted three young men approaching the building and standing in the same location where the police retrieved the shell casings.  All three were dressed in black and were wearing black balaclava masks.  The camera recorded several flashes of light, consistent with a "muzzle flash" created when a firearm is discharged, and the sound of gunshots.  One of the three

2

suspects, a "tall thin individual," wore white sneakers (while the other two wore black shoes), and this suspect's pants had white markings on each thigh.  When this suspect, who subsequently was identified as the juvenile, lifted his arm to fire, his pants fell down slightly and revealed red underpants.

As a result of the investigation, which focused on ascertaining the identity of the suspects, Ovalles obtained video footage recorded by a camera located in the lobby of Central Catholic High School from around 8 P.M. on the night of the shooting (the school video).  The school video showed a group of four young men -- two of whom were wearing white sneakers and black sweatpants with white markings on the thighs. Neither wore a mask and their faces could be seen.  The Commonwealth's theory at trial, which the jury could have found, was that the taller, thinner person wearing white sneakers was the juvenile.  The video footage also showed the juvenile and the other individuals leaving the school and walking in the direction of the residence where the shooting occurred, which Ovalles estimated to be about a thirty-minute walk away.

Based on the information described above, the police obtained an arrest warrant for the juvenile and a search warrant for his home, which they executed on the morning of February 22, 2022.  Ovalles and other officers were positioned in vehicles close to the juvenile's home when, at approximately 10:20 A.M.,

3

the juvenile and another individual, subsequently identified as Zandre Ramos, arrived by car.  The two were wearing balaclava masks.  They got out of the car and as they walked toward the juvenile's house, they "put[] . . . their hands in their waistband[s]" and repeatedly looked back at one of the police vehicles.  When confronted by one of the officers near the driveway of the house, both the juvenile and Ramos fled.  A loaded Taurus G2C 9-milimeter gun (the Taurus firearm) was subsequently found on the path taken by the juvenile and Ramos. The firearm's magazine, which was capable of holding thirty rounds of ammunition, held twelve live rounds.  Eventually, the juvenile was apprehended by Ovalles and Ramos was found hiding under a car by other officers.  When Ramos was arrested, the police found a Walther 45 firearm in his right front jacket pocket.  During the search of the juvenile's home, the police seized a pair of red underpants and a pair of white Nike sneakers.

Thereafter, the Taurus firearm was submitted for testing at the Massachusetts State Police Crime Laboratory, where Sergeant Kevin Callahan determined that eighteen of the shell casings recovered from the scene of the shooting had been fired from that same weapon.  The Taurus firearm also was tested for fingerprints and the presence of deoxyribonucleic acid (DNA). The results were inconclusive:  no identifiable fingerprints

4

were found, and the profile from the DNA sample was not suitable for comparison.

The juvenile did not have a cell phone with him when he was arrested. At the police station, he asked the police if they had it. They did not. However, about three months later, one of the juvenile's neighbors found a cell phone in his backyard. The neighbor charged the cell phone and, after viewing its contents, brought it to the Lawrence police department. The police obtained a search warrant for the cell phone and found, among other things, a photograph, which the Commonwealth asserted was of the juvenile posing with a firearm. The firearm appeared to be similar (if not identical) to the Taurus firearm. It was the same make and model and had an extended magazine like the Taurus firearm. In addition, photographs of the juvenile's birth certificate and social security card were retrieved from the cell phone.

As we have noted, the Commonwealth's theory of guilt, as articulated by the prosecutor in her closing remarks, was that the tall, thin person in the school video wearing white sneakers and black sweatpants with white markings was the juvenile. According to the prosecutor, after leaving the school, the juvenile donned a balaclava mask and walked to the crime scene, where the video clips depict him (wearing the same clothing) firing at the residence. In addition, the Commonwealth asserted

5

that the juvenile had dropped both the Taurus firearm (which had been used in the shooting) and his cell phone (which contained a photograph of him holding that same firearm) while he was running from the police.

The juvenile did not present any evidence.  As we discuss in more detail below, he claimed that he was not the shooter.  Through cross-examination and argument, he attempted to demonstrate that the police failed to sufficiently connect him to the items seized from his house, the Taurus firearm, and the contents of the cell phone found three months after he was arrested.

Discussion.  1.  Ineffective assistance of counsel during opening statement.  In his opening statement, the juvenile's lawyer stated that the evidence would show that the juvenile was "not the shooter" and that another juvenile, Joseph,[2] whom defense counsel described as a "convicted felon," was the culprit.  As framed by defense counsel, Joseph was a likely suspect because he had been convicted of a "gun crime" and when the police searched Joseph's house they found a firearm and two magazines "in his bureau drawer."[3]  Defense counsel also claimed

_____

[2] A pseudonym.

[3] Relevant here, defense counsel stated:

"The police were looking for three suspects.  A few days after the shooting on February 18th, they focused on one.

6

that the evidence would show that multiple people (other than the juvenile) had access to the Taurus firearm and pointed specifically to Ramos and stated that he also had been convicted of a "gun crime."

At the conclusion of defense counsel's opening, the Commonwealth objected. The prosecutor argued first that the prior convictions of Joseph and Ramos were not admissible because defense counsel had not obtained certified copies of the convictions. Second, the prosecutor asserted that evidence that the crime was committed by Joseph was not admissible third-party

---

[Joseph]. [Joseph] was a good choice. I -- [Joseph], was already convicted of a gun crime for something that happened in 2019. When the police went to his house and searched for evidence, they found a gun in his bureau drawer. They found a magazine in his bureau drawer. They found a second magazine in a different bureau drawer. They found clothes, a black top, black bottoms, black shoes that matched one of the shooters. The police got a search warrant for his cell phone. The police sought cell phone location data so they know where [Joseph] was on the night of the shooting. They saw call records, phone calls, texts to see who [Joseph] was communicating with on the night of the shooting. . . . And when the police went to [the juvenile's] house to search for evidence, they didn't find a black top like they did at [Joseph's] house. They didn't find black pants like they did at [Joseph's] house. . . .

"Now, the Commonwealth mentioned a gun. . . . Multiple people had that gun. And there are multiple people in this case. [Joseph] convicted felon, convicted of a gun crime in 2019. Andre Ramos (phonetic) . . . convicted of a gun crime in 2019. Multiple people had that gun. . . . And I'll suggest to you at the end of this case, [the juvenile] is not the shooter, that gun did not belong to [the juvenile], I will ask you to find [the juvenile] not guilty."

7

culprit evidence because Joseph was a codefendant, who, in fact, had also been charged in connection with the shooting. A lengthy discussion between the parties and the judge, which continued the following day, ensued. Ultimately, the judge found that the proffered evidence would tend to confuse the jury. Relying on the reasoning set forth in Commonwealth v. Silva-Santiago, 453 Mass. 782, 800-801 (2009),[4] the judge concluded that the evidence was inadmissible.[5]

The juvenile now argues that defense counsel was ineffective because he failed to deliver on his promise that the jury would hear evidence that Joseph and Ramos were both convicted felons and that Joseph was the true culprit in the shooting.

As an initial matter, because the juvenile did not raise his claim of ineffective assistance in a motion for new trial, we must first decide whether the factual basis of the claim appears indisputably on the record. See Commonwealth v. Keon

---

[4] "[T]he admission of feeble third-party culprit evidence poses a risk of unfair prejudice to the Commonwealth, because it inevitably diverts jurors' attention away from the defendant on trial and onto the third party, and essentially requires the Commonwealth to prove beyond a reasonable doubt that the third-party culprit did not commit the crime." Silva-Santiago, 453 Mass. at 800-801.

[5] See Commonwealth v. Connors, 95 Mass. App. Ct. 46, 53 (2019) (third-party culprit evidence not admissible when claimed third-party is principal and defendant is charged under theory of joint venture).

K., 70 Mass. App. Ct. 568, 573-574 (2007) ("[o]ur courts strongly disfavor raising claims of ineffective assistance on direct appeal [which] . . . should only be brought . . . when . . . the issues do not implicate any factual questions more appropriately resolved by a trial judge" [quotation and citation omitted]). The claim raised here is sufficiently developed on the record. Therefore, we conclude that it is appropriate for us to resolve, in the first instance, whether the juvenile received ineffective assistance.

Turning to the merits, in order to prevail, the juvenile must meet his burden under the familiar two-pronged test set forth in Commonwealth v. Saferian, 366 Mass. 89, 96 (1974). He must show that (1) counsel's conduct fell "measurably below that which might be expected from an ordinary fallible lawyer" and (2) the conduct "likely deprived the [juvenile] of an otherwise available, substantial ground of defen[s]e." Id.

Our case law recognizes that "failure to present critical evidence that has been announced in an opening statement can have drastic ramifications." Commonwealth v. McMahon, 443 Mass. 409, 425 (2005). At the same time, "failure to produce evidence that counsel has predicted in an opening does not automatically amount to ineffective assistance of counsel." Id. Where, as here, a prediction regarding evidence is made, we look to see whether there was adequate preparation and whether counsel had

9

any control over the subsequent failure to produce the evidence. Id.

We assume without deciding that a lawyer of ordinary skill and training would have known that, in light of the fact that Joseph was an alleged coventurer, the admissibility of third-party culprit evidence as described in the opening statement was dubious. We further assume that defense counsel should have obtained certified copies of any criminal convictions or delinquency adjudications and had a plan to introduce them. That said, even if defense counsel's conduct fell below what is required from an ordinary fallible lawyer, the juvenile has not demonstrated that such conduct deprived him of an otherwise available defense.

The defense theory was that the juvenile was not the shooter and was not the person who had dropped the Taurus firearm. To this end, in addition to pointing to Joseph as the more likely perpetrator and effectively suggesting that Ramos had access to the Taurus firearm and could have been the one to discard it, defense counsel stated that the case was about "evidence that is missing." He emphasized that no one would testify that the juvenile was at the scene of the shooting; the police could not connect the items seized from the juvenile's house (the underwear and sneakers) to the juvenile directly; and the mixture of DNA on the firearm, which no one saw the juvenile

10

drop, showed that "[m]ultiple people had that gun."  Defense counsel did in fact pursue this theory of defense.  For example, he elicited testimony from Ovalles that he had "no idea" if the red underwear was the juvenile's size or what size sneaker the juvenile wore.  And, in his closing, defense counsel again claimed that the juvenile "is not the shooter" and, referring to the Taurus firearm, stated that he did not possess "that gun."  Indeed, defense counsel returned to the claims that he made in his opening, namely that no one identified the juvenile as the shooter, no one saw him discard a firearm on the day he was arrested, and the DNA testing of the Taurus firearm did not connect the juvenile to it.  See Commonwealth v. Garvin, 456 Mass. 778, 791 (2010) (where counsel did not "abandon" defense theory, failure to produce evidence promised in opening statement did not constitute ineffective assistance).

Finally, we do not view the proffered evidence as "critical."  It was undisputed that the other suspects were armed and fired at the house.  It was also undisputed that Ramos was armed on the day he and the juvenile were arrested.  Consequently, evidence that Joseph and Ramos had prior convictions or adjudications for firearm offenses would add little to nothing about the crimes at issue.  Compare Commonwealth v. Martin, 484 Mass. 634, 641-642 (2020) (no new trial required despite defense counsel's "manifestly

11

unreasonable" declaration in opening that coventurer would testify because there was overwhelming evidence that defendant planned crime); Commonwealth v. Taylor, 463 Mass. 857, 868-870 (2012) (defense counsel's promise to "prove" defendant was not shooter, despite overwhelming evidence, and his unsubstantiated assertion that shooter's camouflage pants were common may have constituted conduct falling measurably below that of ordinary fallible lawyer but did not warrant new trial).

In addition, the judge instructed the jury that openings are not evidence both before and after the opening statements, and did so again in his final charge to the jury. The judge also instructed the jury not to speculate about evidence that was not introduced at trial. We presume that the jury understood and followed these instructions. See Commonwealth v. Toolan, 490 Mass. 698, 703 (2022).

2. Ovalles's testimony relating to the surveillance video footage and photographs. One of the primary issues at trial was the identification of the juvenile as a shooter. To prove identification, the Commonwealth relied on the video clips and still photographs taken from surveillance video footage as described above.

a. Motions in limine. Prior to trial, the Commonwealth filed a motion in limine seeking permission to allow Ovalles to testify as a lay witness and, based on his familiarity with the

12

juvenile, permit him to identify the juvenile as one of the suspects shown on the video clips depicting the shooting and as the individual wearing similar clothing and no mask on the school video.  The juvenile filed a similar motion seeking to exclude such testimony.  Following a hearing at which Ovalles testified, the judge concluded that permitting him to identify the juvenile in this manner "usurps the province of the jury." Consequently, the judge denied the Commonwealth's motion and allowed the juvenile's motion.[6]  At the hearing, the Commonwealth also requested that Ovalles be permitted to identify the juvenile as the person posing with a firearm in a photograph retrieved from the cell phone, which the Commonwealth maintained belonged to the juvenile.  This request was denied.  The judge did, however, rule that Ovalles could identify the juvenile as the person he arrested on February 22, 2022.

In addition, the juvenile filed a motion in limine to exclude what he described as Ovalles's opinion testimony, comparing the pieces of clothing worn by the suspects in the video clips of the shooting with those worn by the individuals in the school video.  The juvenile argued that such opinion

_____

[6] In so ruling, the judge noted that Ovalles did not have a high degree of familiarity with the juvenile, the images were sufficiently clear and, despite the Commonwealth's argument to the contrary, the juvenile's hair style had not changed significantly.

13

testimony would impermissibly invade the province of the jury, who, as the finders of fact, should be allowed to reach their own conclusions regarding similarities in the clothing.  This motion was allowed.

b.  Ovalles's trial testimony.  At trial, Ovalles did not always adhere to the judge's rulings.  The juvenile first points to three specific instances where, he contends, Ovalles's testimony violated the judge's instructions and, in one instance, constituted inadmissible opinion evidence.  While we do not condone any failure to strictly comply with the judge's rulings, we conclude that none of the challenged testimony was so prejudicial as to require a new trial.

First, at one point while testifying about the events of February 22, 2022, the day on which the juvenile and Ramos were arrested, Ovalles said:  "At that time I knew who they were based on my encounters with both of them.  It was [the juvenile]."[7]  Although defense counsel initially objected, he later withdrew his objection on the ground that the judge had ruled that Ovalles could identify the juvenile as the person he arrested.  And, in fact, Ovalles went on to testify without any objection that when he apprehended the juvenile, he removed the juvenile's mask and identified him.  While we agree with the

_____

[7] At that time, both the juvenile and Ramos were wearing balaclava masks.

14

juvenile that Ovalles's reference to previous "encounters" with him went beyond what the judge deemed to be admissible, the error did not create a substantial risk of a miscarriage of justice. The reference was vague and did not necessarily imply that the encounters stemmed from prior criminal conduct by the juvenile. See Commonwealth v. Cintron, 103 Mass. App. Ct. 799, 805 (2024) (testimony from police officer that he was familiar with defendant and recognized him from prior dealings did not create substantial risk of miscarriage of justice). More importantly, the jury could reasonably infer that by the time Ovalles went to the juvenile's home to execute a search warrant, a week after the shooting, he was in a position to identify the juvenile. Lastly, the jury were instructed not to speculate on matters for which there was no evidence, and the prosecutor did not allude to Ovalles's remark in her closing argument.

Second, when Ovalles was shown a photograph, retrieved from the cell phone that, according to the Commonwealth, had been dropped by the juvenile when he ran from the police, he said he recognized it as "a picture of two brothers [he was] familiar with." Defense counsel objected. The judge sustained the objection. After discussing the various alternatives, the judge decided to give the jury the following curative instruction:

> "[Y]ou heard some testimony from Detective Ovalles that he was familiar with individuals depicted in a photo. And I'm instructing you to disregard that comment and not to draw

15

any negative inferences therefrom.  Detective Ovalles similarly testified that he was born and raised in the city of Lawrence, so his familiarity with individuals depicted in the photo has no particular relevance to this case, nor is it probative of any of the issues in this case.

"You are therefore instructed to disregard that -- just that portion of his testimony and not consider it in the deliberations in your case."

As noted, our review is for prejudicial error.  "This means that we inquire whether there is a reasonable possibility that the error might have contributed to the jury's verdict" (citation omitted).  Commonwealth v. Odgren, 483 Mass. 41, 46 (2019).  While we agree with the juvenile (and the judge) that the challenged testimony was inadmissible, there is not "a reasonable possibility that the error might have contributed to the jury's verdict."  Id.  This is because the judge's instruction, which we presume was followed, was immediate, specific, and forceful.  Most importantly, the judge reminded the jury that Ovalles "testified that he was born and raised in the city of Lawrence, so his familiarity with [the juvenile] has no particular relevance to this case."  This reduced the danger that the jury would have assumed that Ovalles knew the juvenile because of his prior involvement in the criminal justice system. See Commonwealth v. Martinez, 476 Mass. 186, 194 (2017).

Third, the juvenile argues that Ovalles impermissibly opined that a person shown on the school video wore clothing "consistent with" the clothing worn by the shooter in the

16

surveillance video footage. While the admission of this testimony presents a closer question, it does not warrant reversal of the convictions stemming from the shooting.

As we have explained, Ovalles viewed surveillance camera video footage that captured the shooting and described what was depicted.  Three suspects, wearing black balaclava masks that covered their faces, were standing where several shell casings were later found.  Ovalles noted that one of the suspects stood out because he was tall and thin and was wearing white sneakers.  Ovalles also noted that this shooting suspect was wearing pants that had "two labels" -- "one on his left thigh and one on his right thigh."  Ovalles described the white labels as "some sort of insignia" that "make it very distinguishable."

Ovalles also viewed the school video footage.  He noted that one young man, who was tall and thin, was wearing white sneakers and black pants with markings "[c]onsistent with" the black pants that the shooting suspect had been wearing.  This person was not wearing a mask and so the jury could see his face.  Defense counsel objected to this testimony, renewing the objection he had raised in his motion in limine.  The juvenile further contends that the prejudicial nature of this testimony was augmented by the placement of yellow arrows on the still photographs pointing to the areas of comparison.

17

Because the juvenile objected to this testimony, "we review the judge's evidentiary ruling for prejudicial error resulting from an abuse of discretion." Commonwealth v. Gomez, 495 Mass. 688, 696 (2025).

"The identification of an individual from a photograph or video image is an expression of lay opinion." Gomez, supra, citing Commonwealth v. Pina, 481 Mass. 413, 429 (2019). A witness may offer an opinion concerning the identity of someone on a video recording "when the witness possesses sufficiently relevant familiarity with the defendant that the jury cannot also possess" (citation omitted). Commonwealth v. Vacher, 469 Mass. 425, 441 (2014). See Mass. G. Evid. § 701 note (2025) ("witness's opinion concerning the identity of a person depicted . . . [on videotape] is admissible only where that witness is more likely than the jury to identify the person correctly from" videotape). Without such a foundation, lay opinion identification is improper, as it usurps the jury's ability to draw their own conclusions regarding the identity of the individual depicted on videotape. Commonwealth v. Wardsworth, 482 Mass. 454, 475 (2019).

Two recent Supreme Judicial Court cases are particularly instructive here. First, in Commonwealth v. Wardsworth, 482 Mass. at 474-475, a detective opined that a person shown in surveillance video footage was dressed "similar[ly]" to the

18

defendant, and a second detective not only opined that the defendant's attire "was a definitive match to that of what [he] saw in the video earlier in the evening," but also concluded that the defendant "appeared to be the same person from the video." The Commonwealth also introduced "photographs of the defendant, with arrows pointing to the 'points of comparison [a detective] used when looking at the video.'" Id. at 474. The Supreme Judicial Court held that this constituted improper lay opinion testimony. Id. at 476.

In Commonwealth v. Gomez, 495 Mass. at 695, "a Springfield police department civilian employee, created a thirteen-minute compilation video from surveillance footage introduced in evidence." He testified that he focused on "certain items of clothing," without elaboration. Id. "He then placed a location marker (a red circle) in several portions of the compilation video around the entire body of individuals that we were looking at" (quotation omitted). Id. The Supreme Judicial Court ruled that it was within the trial judge's discretion to determine that it was permissible to invite the jury to compare the defendant to the individual in the video, "but not [to] draw[ ] the conclusion that it's a match." Id. at 696, 697. The overlaid red circles in portions of the compilation videotape were permissible, because they "functioned as 'the electronic version' of a witness wielding an old-fashioned wooden pointing

19

stick."  Id.  The Supreme Judicial Court concluded that:

> "there was no error because no witness identified the
> defendant as the shooter depicted in the compilation
> video.  [A civilian police employee] explained that he
> compiled surveillance footage from different cameras and
> then placed location markers on 'individuals that we
> were looking at' based on 'certain items of clothing.'
> Importantly, he neither described these items of
> clothing to the jury nor used the compilation video to
> compare items of clothing in the images of the shooter
> to those undisputably worn by the defendant."

Gomez, 495 Mass. at 697.

Here, Ovalles never identified the shooter in the
surveillance video footage or anyone in the school video as the
juvenile.[8]  Accordingly, Ovalles's testimony is distinguishable
from the inadmissible opinion testimony in Wardsworth, 482 Mass.
474.  On the other hand, unlike the witness in Gomez, Ovalles
did describe the white insignia on the shooter's pants as "very
distinguishable."  Moreover, Ovalles reviewed a still photograph
from the school video and noted that one of the people depicted
had markings on his pants that "were the same colors" and "in

_____

[8] The Commonwealth introduced booking photographs of the
juvenile from his arrest one week after the shooting.  In her
closing argument, the prosecutor then urged the jury to find
that the tall, thin young man wearing the white sneakers in the
school video was the juvenile and that, based on the
similarities between the clothing worn by the suspect in the
surveillance camera video footage and the juvenile in the school
video, the juvenile was the shooter.  This was permissible
argument.  See Gomez, 495 Mass. at 699 ("A prosecutor in a
closing argument may argue forcefully for a conviction based on
the facts in evidence and the reasonable inferences drawn from
those facts").

20

the same places."  And, as noted, Ovalles's testimony was augmented by the placement of yellow arrows on the still photographs pointing to the areas of comparison.  This testimony may have invaded the province of the jury as fact-finder.  Compare Commonwealth v. Robertson, 489 Mass. 226, 236-237 (2022) (Commonwealth witness "arguably came too close to the line of improper lay opinion" by testifying that he was "looking for similar features" between individual in photographs taken at scene of shooting and known photograph of defendant).

The Commonwealth concedes, that the admission of photographs, on which arrows pointed to the areas of similarity, fell close to the line of inadmissibility.  See Commonwealth v. Wood, 90 Mass. App. Ct. 271, 279-280 (2016).  The better practice would have been for the Commonwealth to use the photographs as a chalk during Ovalles's testimony.  Compare Commonwealth v. Lavin, 101 Mass. App. Ct. 278, 296-297 (2022).

Nevertheless, accepting that Ovalles expressed an improper lay opinion that the person seen in the school video wearing pants with white markings was the same person seen at the shooting wearing pants with white markings, we cannot say that this testimony constituted reversible error.  First, the jury could reasonably infer that the juvenile dropped the Taurus firearm used in the shooting as he fled from Ovalles a week after the shooting.  Second, police found a photograph of the

21

juvenile holding a firearm seemingly identical to the Taurus firearm on his cell phone.[9]  Third, the jury could have concluded that the juvenile was depicted in the school video based on a comparison of his features at trial and in his booking videotape to the tall, thin person in the school video wearing white sneakers.  Fourth, notwithstanding that Ovalles arguably invaded the fact-finding province of the jury, the jury could have independently compared the school video to the surveillance video footage and concluded that the pants with white markings in each videotape were similar enough to conclude that they depicted the same person.  Fifth, police recovered white Nike sneakers and red underwear from the juvenile's home.  In combination, this evidence establishes any error by Ovalles was harmless.  See Robertson, 489 Mass. at 238 ("potentially" impermissible lay identification opinion, admitted over objection, was harmless because "the jury could have concluded independently that the defendant was the individual in the photographs" at crime scene); Vacher, 469 Mass. at 442 (erroneous admission of police officer's lay identification opinion, admitted over objection, was harmless where it "did not overwhelm the other compelling, properly admitted evidence

---

[9] The jury could reasonably infer that the cell phone belonged to the juvenile because it also contained photographs of his birth certificate and Social Security Card.

against the defendant" and jury "were capable of drawing the same conclusion" as lay witness).

Next, the juvenile argues that Ovalles improperly provided "extensive narration" when he was asked about the content of the video clips. He contends that Ovalles described the physical characteristics of the scenes depicted in the video clips in an "unhelpful" and "unsupported" manner. There was no objection to this testimony, and we discern no error let alone a substantial risk of a miscarriage of justice. Here, Ovalles was familiar with the area, and his testimony provided nonprejudicial context in orienting the jury to the position of certain buildings and the direction from which the suspects arrived at and departed from the scene of the shooting. See Commonwealth v. Grier, 490 Mass. 455, 476 (2022) (no prejudice where testimony was of "no import" and merely provided context to better situate the scene). Nor did Ovalles's references to the housing "projects" located nearby render the testimony unduly prejudicial. Ovalles said nothing disparaging about the housing authority properties. Similarly, Ovalles's description of the direction the suspects took when they walked away from the high school was inconsequential. As we have noted, the primary issue was the identity of the juvenile as one of the three shooters and the direction of travel taken by the suspects had little to no bearing on that question.

The juvenile also argues that Ovalles's claim that the flashes of light seen on the video clips were "muzzle flashes" was erroneously admitted for two reasons.  First, he claims that Ovalles was not an expert, or qualified as one, and therefore could not opine on the issue.  Second, he claims that the jury could have determined what was depicted on the video clips for themselves.  We discern no prejudicial error.[10]  Apart from the fact that Ovalles had expertise in the area (he testified that he was a member of the special weapons and tactics [SWAT] team and was trained in the use of firearms), as the juvenile acknowledges, it did not require any special expertise to conclude that the flashes came from the firearms as the suspects were shooting.  At best, this testimony was a superfluous statement of the obvious.  And even if the jury did rely on this testimony, there could be no prejudice because there was no dispute that a shooting had occurred, and the surveillance video footage also contained an audio recording of the gunfire at the same time as the flashes of light.  See Grier, 490 Mass. at 476.

3.  Jury instruction on consciousness of guilt.  As previously discussed, the Commonwealth presented evidence that the juvenile ran from the police before he was arrested on February 22, 2022.  It is well settled that evidence of flight

_____

[10] The juvenile objected to this testimony.

24

is probative of a consciousness of guilt and the judge so instructed the jury. See Commonwealth v. Toney, 385 Mass. 575, 583 (1982). Although the juvenile did not object to the instruction as given, he now claims that the judge committed reversible error by endorsing the factual conclusion that the juvenile knew he was going to be arrested. He argues that even though flight "may be probative of a consciousness of guilt regardless of whether [the defendant] has actual knowledge that he is being sought by the police," Toney, 385 Mass. 583, the first sentence of the judge's instruction favored the Commonwealth and, as a result, improperly bolstered the case against the juvenile. Specifically, the judge stated:

> "You have heard evidence suggesting that the defendant may have fled when he was discovered and was about to be arrested for the offenses for which []he's now on trial. If . . . the Commonwealth has proved that the defendant did flee, you may consider whether such actions indicate feelings of guilt by the defendant and whether in turn, such feelings of guilt might tend to show actual guilt on these charges.

> "You are not required to draw such inferences and you should not do so unless they appear to be reasonable in light of all of the circumstances of this case. If you decide that such inferences are reasonable, it will be up to you to decide how much importance to give them. But you should always remember that there may be numerous reasons why an innocent person might do such things. Such conduct does not necessarily reflect feelings of guilt. Please also bear in mind that a person having feelings of guilt is not necessarily guilty, in fact for such feelings are sometimes found in innocent people. Finally, remember that standing alone with such evidence is never enough by itself to convict a person of a crime. You may not find the defendant guilty on such evidence alone, but you may

25

consider it in your deliberations along with all of the other evidence. . . .

"[I]n this case, the prosecution is arguing that the [f]light at issue, in this case, is evidence of consciousness of guilt, and so I must instruct you that you may but don't need to consider such evidence as a factor tending to prove the defendant's guilt. You may not convict on the basis of such evidence alone, as I've just explained to you, and that flight or similar conduct does not necessarily reflect feelings of guilt since there are numerous other reasons why an innocent person might flee. And finally, that even if flight or similar conduct demonstrates feelings of guilt, it does not necessarily mean that the defendant is guilty in fact. As I've just explained to you, there are plenty of times when people who are innocent may have guilty feelings."

Given the absence of an objection, we review the alleged error for a substantial risk of a miscarriage of justice. See Commonwealth v. Taranovsky, 93 Mass. App. Ct. 399, 405 (2018). There was no such risk here. The instruction itself followed the model jury instructions almost verbatim. See 3.580 Model Jury Instructions for Use in the District Court (2024). See Commonwealth v. Doughty, 491 Mass. 788, 801 (2023) ("Instructions that convey the proper legal standard, particularly when tracking model jury instructions, are deemed correct"). More importantly, the challenged portion of the instruction did not "contain words tending to endorse as true any inference." Commonwealth v. Harmon, 63 Mass. App. Ct. 456, 465 (2005). In sum, the judge gave a proper explanation of consciousness of guilt and did not improperly suggest what the jury should or should not infer from the evidence.

26

4.  The split sentence.  The juvenile was sentenced to a term of four and one-half to five years in State prison in connection with the first youthful offender adjudication, which was based on the convictions of offenses stemming from the shooting.  On the second adjudication, based on convictions of crimes related to the events surrounding the juvenile's arrest, the judge imposed a two and one-half years term of incarceration in a house of correction, with eighteen months to be served, and the balance suspended for five years.  The sentence imposed on the second adjudication was to be served concurrently with the State prison sentence imposed on the first one.  The juvenile claims the split sentence on the second youthful offender adjudication was an illegal sentence because, he contends, the governing statute, G. L. c. 269, § 10 (a), does not permit the imposition of a suspended sentence.  We disagree.

"When construing a statute, we look first and foremost to the language of the statute as a whole and strive to give effect to each word" (quotations and citations omitted).  Commonwealth v. Vigiani, 488 Mass. 34, 36 (2021).  "A fundamental tenet of statutory interpretation is that statutory language should be given effect consistent with its plain meaning and in light of the aim of the Legislature unless to do so would achieve an illogical result."  Id., quoting Rahim v. District Attorney for the Suffolk Dist., 486 Mass. 544, 547 (2020).

27

A person convicted pursuant to G. L. c. 269, § 10 (a), as was the juvenile in this case:

> "shall be punished by imprisonment in the state prison for not less than two and one-half years nor more than five years, or for not less than 18 months nor more than two and one-half years in a jail or house of correction. The sentence imposed on such person shall not be reduced to less than 18 months, nor suspended, nor shall any person convicted under this subsection be eligible for probation, parole, work release, or furlough or receive any deduction from his sentence for good conduct until he shall have served 18 months of such sentence. . ."

The first sentence of the provision sets forth the range for prison terms in both State prison and in a jail or house of correction. As relevant here, the sentencing range is "not less than 18 months nor more than two and one-half years . . . in a house of correction." The second provision makes clear that the eighteen-month term is a mandatory minimum for jail or house of correction sentences in all respects and cannot be reduced or suspended, and the convicted person cannot be released from incarceration for any reason until the entire eighteen-month term has been served.

While the matter is not free from doubt, we think this language is reasonably susceptible to the juvenile's reading. However, such an interpretation would not be dispositive here. In Commonwealth v. Dones, 492 Mass. 291 (2023), the Supreme Judicial Court addressed the discretion afforded to a Juvenile Court judge to suspend a commitment to the Department of Youth

28

Services where, as here, the juvenile was convicted of unlawful possession of a firearm in violation of G. L. c. 269, § 10 (a). The court determined that the judge had such discretion. More significantly, the court went on to explain that, in any event, the sentencing requirements set forth in G. L. c. 269, § 10 (a), apply to adult offenders and are not implicated in cases involving youthful offenders.[11] Id. at 299. Thus, even if we were to agree with the juvenile that no portion of a sentence imposed under § 10 (a) can be suspended, the judge had discretion to fashion an appropriate sentence that takes into consideration rehabilitation and encouragement even if that sentence falls below the proscribed sentencing range.

Adjudications of delinquency and judgments affirmed.

By the Court (Vuono, Henry & Wood, JJ.[12]),

Clerk

Entered: August 21, 2025.

---

[11] We note that although "an 'adjudication' that a child has violated a law generally is not a 'conviction' of a crime," Commonwealth v. Connor C., 432 Mass. 635, 646 (2000), there is a narrow exception that a "previous adjudication of delinquency" for violation of G. L. c. 269, § 10 (a), is considered a "conviction" as that term is used in G. L. c. 269, § 10 (d), relating to subsequent offenses. Connor C., 432 Mass. at 646.

[12] The panelists are listed in order of seniority.